SEALED

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

|  |  |
|---|---|
| IN THE MATTER OF THE APPLICATION TO OBTAIN LOCATION DATA CONCERNING THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (470) 462-9908 | Magistrate Case No. 7:20-mj-1331-RJ<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent James D. Byers, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.    I submit this affidavit in support of an application for the renewal and extension of a search warrant filed August 12, 2020 (7:20-mj-1191-RJ); renewed and extended September 11, 2020 (7:20-mj-1232-RJ); renewed and extended October 8, 2020 (7:20-mj-1267-RJ); and renewed and extended November 13, 2020 (7:20-mj-1297-RJ) under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c) to authorize law enforcement to employ an electronic investigative technique, described in Attachment B, for information about the location of the cellular telephone assigned call number **(470) 462-9908** (the "**TARGET CELL PHONE**") used by DON EUGENE NIXON, described in Attachment A, whose service provider is Verizon Wireless ("the Provider"), a wireless telephone service provider that is headquartered at 180 Washington Valley Road, Bedminster, NJ, 07921.



1

2.     As stated below, the information provided by this order will be helpful in establishing patterns of travel and locations frequented by DON EUGENE NIXON, JR. a/k/a "Storm," a/k/a "Redd," (hereinafter, "NIXON"). However, the information requested in this search warrant will also help to develop further details concerning NIXON's drug trafficking activities and organization.

3.     Based on information obtained through the course of this investigation, I believe the current user of this device is an individual named NIXON, who is involved in the distribution of heroin and cocaine. Verizon Wireless is a provider of wireless communications service, Verizon Wireless is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

4.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a) and 846 (possession and distribution of controlled substances and conspiracy to distribute and possess with the intent to distribute controlled substances), have been committed, are being committed, and will be committed by NIXON utilizing the **TARGET CELL PHONE**. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes as further described in Attachment B.

5.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

2



6.      The **TARGET CELL PHONE** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

**AGENT BACKGROUND**

7.      I have been employed by the FBI for over five years. I have served as a Special Agent with the FBI for approximately one year and previously served as an FBI Intelligence Analyst for approximately four years. In these positions, I have been responsible for investigating various violations of federal law, including but not limited to violations of the Controlled Substances Act. I have experience and received training in federal law enforcement investigations. I have participated in the execution of numerous search and arrest warrants involving drug and firearms offenses and gathered drug, firearms and non-firearms related evidence. Additionally, I have participated in interviews of witnesses and conducted surveillance of investigation targets. It is within my duties as a Special Agent to investigate complex state and federal drug trafficking conspiracy cases using the electronic interception of telephonic communications and the use of vehicular GPS systems to supplement physical surveillance. I have directed and participated in investigations of criminal violations of the Controlled Substances Act, including, but not limited to, Title 21, United States Code, Sections 841, 843, 846, and Title 18, United States Code, Sections 922, and 924; as well as the aiding and abetting the above offenses, in violation of Title 18, United States Code, Section 2.

8.      As a Special Agent, I have participated in numerous investigations of drug trafficking offenses related to heroin, cocaine, fentanyl, and other illegal

3

narcotics. I have conducted or participated in surveillance operations, controlled purchases of illegal narcotics, the execution of search and arrest warrants, debriefings of informants, analyzing pen registers, and monitoring court-authorized wire intercepts.

9. Based upon your affiant's training, experience, and participation in investigations of suspects involved with large amounts of heroin, cocaine, and/or other controlled substances, your affiant knows:

a. Drug traffickers frequently use cellular telephones to conduct their drug trafficking activities. Drug traffickers frequently use cellular telephones to make and receive phone calls and send and receive messages via "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), which are often referred to generically as "text messages", to communicate with their sources of supply of drugs and drug customers in order to negotiate and facilitate the purchase and sale of drugs.

b. Drug traffickers frequently change, drop, discontinue and/or further compartmentalize cellular telephones in the event of law enforcement actions. Drug traffickers commonly employ these tactics to insulate themselves and protect their interest in the organization as well as the organization's interest.

c. Drug traffickers frequently use "stash houses", which are residences or other buildings which are separate from their place of residence used to store drugs, weapons, and/or the proceeds of their drug transactions. Often, "stash houses" are purchased or rented under another individual's name in order to insulate the drug



4

trafficker and make it more difficult for law enforcement to identify the location of drugs, weapons, and the proceeds of drug transactions.

10.     Through this experience, I am familiar with drug traffickers' methods of operation, including techniques commonly used to distribute, store, and transport narcotics, as well as to collect and launder proceeds of their narcotics trafficking activities. Through my experience with the FBI as a special agent and working with other narcotics officers, I am also familiar with the coded language, or slang, narcotics buyers and sellers use to communicate related to drug transactions.

11.     The facts in this affidavit come from my personal observations, my training and experience, my reviews of documents and prison telephone calls, analysis of telephone toll information, information provided by sources of information, and information obtained from other agents and witnesses. The affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

12.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841 and 846 (hereinafter referred to as "TARGET OFFENSES") have been committed, are being committed, and will be committed by "NIXON". There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of "NIXON" and other individuals who are engaged in the commission of these offenses.

5



13.     Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," see 18 U.S.C. § 3127(3) & (4), this warrant is designed to comply with the Pen Register Statute as well as Rule 41 and 18 U.S.C. § 2703(c). See 18 U.S.C. §§ 3121-3127. This warrant therefore includes all the information required to be included in a pen register order. See 18 U.S.C. § 3123(b)(1).

**PROBABLE CAUSE**

14.     In February 2020, the FBI began working to investigate a Drug Trafficking Organization (DTO) operating in the Wilmington, North Carolina area. During the course of the investigation, it was learned that NIXON was involved in the distribution of large quantities of heroin and cocaine in the Wilmington area. During interviews with cooperating defendants and reliable confidential sources of information, the FBI learned that NIXON and members of the DTO were involved in the trafficking of heroin and cocaine dating back to at least 2017. NIXON is known to distribute significant amounts of narcotics in the Wilmington, NC area. NIXON's DTO supplies multiple narcotics dealers in the Wilmington, NC area as well as other parts of North Carolina.

15.     During the course of the investigation, agents have conducted numerous interviews of people familiar with NIXON's DTO. Through these interviews, agents have identified numerous persons that are supplied by NIXON and his DTO with heroin and other narcotics in the Wilmington, NC area.



6

16. In March 2020, Cooperating Defendant 1 (hereinafter, "CD-1") informed investigators that CD-1 had accompanied an individual who purchased approximately one ounce of raw heroin on approximately four separate occasions from NIXON at a stash house used by NIXON to store illegal narcotics near Scotts Hill, NC from 2018 until CD-1's arrest in 2019.

17. In May 2020, Confidential Human Source 1 (hereinafter, "CHS-1"), informed investigators that CHS-1 purchased heroin from NIXON from approximately September 2017 until approximately July 2019. CHS-1 contacted NIXON via telephone calls and text messages to order heroin from NIXON at several different telephone numbers during this time. CHS-1 informed investigators of two stash houses in the Wilmington, NC area used by NIXON to store illegal narcotics. CHS-1 also informed investigators that JERMAINE PIERRE THOMAS is a heroin dealer who is friends with NIXON. CHS-1 further informed investigators that TERRY WAYNE SHERMAN is a heroin dealer who knows both NIXON and THOMAS. CHS-1 has been proven in the past to provide truthful and reliable information validated by law enforcement.

18. On or about July 2, 2020, CHS-1 informed investigators that NIXON's new telephone number was the **TARGET CELL PHONE**.

19. On or about the afternoon of July 8, 2020, CHS-1 placed a telephone call to the **TARGET CELL PHONE** and spoke with NIXON in the presence of investigators. Investigators recognized the voice of the individual using the **TARGET CELL PHONE** as NIXON based on the investigators' familiarity with NIXON's voice

7



gained from listening to prior jail calls made to a phone used by NIXON which had the same IMEI as the **TARGET CELL PHONE**.

20.    On or about the evening of July 8, 2020, NIXON contacted CHS-1 using the **TARGET CELL PHONE** and then met up with the CHS-1 in person. NIXON told CHS-1 he had been staying out of town and believed law enforcement was watching him because two individuals he supplied with heroin had been arrested recently. NIXON told CHS-1 these individuals were "Webe" (known to your affiant as HERMAN BREWINGTON) and JEREMY GREENE. NIXON told CHS-1 that NIXON would bring CHS-1 heroin before he left town again.

21.    On or about June 22, 2020, the Wilmington Police Department (WPD) executed search warrants on the residence and vehicle of HERMAN BREWINGTON and located approximately $7,400 in U.S. currency, approximately 14 grams of raw heroin, and a small amount of marijuana. WPD then arrested BREWINGTON and charged him with several drug offenses, including trafficking heroin.

22.    On or about June 26, 2020, the New Hanover County Sheriff's Office (NHCSO) executed a search warrant at the residence of JEREMY RUSSELL GREENE and seized approximately 80 grams of raw heroin, three guns, methamphetamine, and marijuana. NHCSO arrested GREENE and charged him with multiple drug offenses, to include: two counts of trafficking heroin, possession of a firearm by a felon, possession of heroin, possession of methamphetamine, and possession of a stolen vehicle.

23.    On the morning of July 19, 2020, SHERMAN met with CHS-1 and told

8

CHS-1 that NIXON is SHERMAN's heroin supplier. SHERMAN also placed a telephone call to NIXON in the presence of CHS-1. During the call, NIXON, using the **TARGET CELL PHONE**, told SHERMAN he would bring drugs to SHERMAN's apartment that morning.

24.     Information received pursuant to the execution of a Federal search warrant (7:20-mj-1166-RJ) on the **TARGET CELL PHONE** showed the **TARGET CELL PHONE** was located in the area of SHERMAN's apartment approximately 30 minutes after the telephone call between SHERMAN and NIXON on July 19, 2020. Based on my training and experience, information from a Federal search warrant, and information from CHS-1, I am informed and believe NIXON and SHERMAN met on July 19, 2020 to conduct a drug transaction.

25.     Later on July 19, 2020, SHERMAN contacted CHS-1 and told CHS-1 to come to SHERMAN's apartment in the Cape Cottage Condominium's in Wilmington, NC. When CHS-1 arrived, SHERMAN got into CHS-1's vehicle and told CHS-1 that NIXON wanted him (SHERMAN) to "look out" for CHS-1 and make sure CHS-1 "was straight". CHS-1 informed your affiant this was NIXON's way of telling SHERMAN to give CHS-1 some of the drugs SHERMAN received from NIXON. SHERMAN then had CHS-1 drive SHERMAN to several locations in Wilmington, NC and then back to the parking lot of SHERMAN's apartment complex. When they returned to the apartment complex, SHERMAN gave the CHS a plastic bag containing what the CHS believed to be heroin as well as a new box of empty glassine bags.

26.     Immediately after leaving SHERMAN's apartment complex on July 19,

9

2020, CHS-1 contacted your affiant. CHS-1 then immediately met your affiant and provided the box of empty glassine bags and the plastic bag containing a powder substance.

27.     On or about July 20, 2020, your affiant and an FBI Task Force Officer conducted a field test of the powder substance CHS-1 obtained from SHERMAN on July 19. The field test produced a presumptive positive indication for the presence of cocaine and fentanyl. The substance was then submitted to the DEA lab for testing.

28.     Information received pursuant to the execution of a Federal search warrant (7:20-mj-1166-RJ) on the **TARGET CELL PHONE** showed the **TARGET CELL PHONE** was located in the area of the Stephens Pointe Apartment Complex, located at 8651 Stephens Church Rd, Building D, Wilmington, North Carolina, at approximately 10:45 A.M. on July 29, 2020. Physical surveillance conducted at the Stephens Pointe Apartment Complex at the time **TARGET CELL PHONE** was located in Building D identified a black 2-door Mercedes in the parking lot which has previously been observed by your affiant at other stash locations believed to be used by NIXON. Surveillance also identified THOMAS walking near Building D of the apartment complex.

29.     On or about July 30, 2020, a Deputy with the New Hanover County Sheriff's Office observed NIXON exit building D and get into the driver's seat of an Acura TL registered to THOMAS and leave the apartment complex. Later, on or about July 30, 2020, the Deputy observed NIXON return driving THOMAS's vehicle. NIXON exited the vehicle, punched in the security code at apartment D207, and

10



entered the apartment.

30. On or about August 4, 2020, SHERMAN contacted CHS-1 and told CHS-1 that SHERMAN expected to be re-supplied with heroin by NIXON sometime during the evening of August 4, 2020.

31. Information received pursuant to the execution of a Federal search warrant (7:20-mj-1166-RJ) on the **TARGET CELL PHONE** and a North Carolina (NC) State Pen Register Trap and Trace (PRTT) on 919-508-7035 (used by SHERMAN) showed both SHERMAN and NIXON's phones were located in approximately the same area of Wilmington, NC at approximately 10:07 P.M. on August 4, 2020. Additionally, several telephone calls occurred between NIXON and SHERMAN on the evening of August 4, 2020. Based on my training and experience, information from a Federal search warrant and NC State PRTT, and information from CHS-1, I am informed and believe NIXON and SHERMAN met on the evening of August 4, 2020 to conduct a drug transaction.

32. On or about August 5, 2020, SHERMAN informed CHS-1 that NIXON only provided SHERMAN with one ounce of heroin. SHERMAN said he would provide some of that heroin to CHS-1.

33. On or about August 5, 2020, CHS-1 conducted a controlled purchase of approximately 15.5 grams of raw heroin from SHERMAN. SHERMAN provided CHS-1 with a plastic bag containing a powder substance and a box of empty glassine bags. SHERMAN told CHS-1 there were 16 grams of heroin in the bag and said CHS-1 owed SHERMAN $1,200 for the drugs.

11

34. On or about August 5, 2020, your affiant and an FBI Task Force Officer conducted a field test of the powder substance CHS-1 obtained from SHERMAN on August 5, 2020. The field test produced a presumptive positive indication for the presence of heroin. The substance was then submitted to the DEA lab for testing.

35. On August 20, 2020, at approximately 1:11 p.m., your affiant observed NIXON walk out the front door of 141 N. Front Street[1] and answer a cellular telephone on his person. Your affiant reviewed a PRTT attached to the **TARGET CELL PHONE** and observed an incoming call to the **TARGET CELL PHONE** from 910-409-4705 on August 20, 2020, at 1:11 p.m. Information received pursuant to the execution of a Federal search warrant (7:20-mj-1191-RJ) on the **TARGET CELL PHONE** showed the **TARGET CELL PHONE** was located in the vicinity of 141 N. Front Street on August 20, 2020 at approximately 1:00 p.m.

36. On or about August 23, 2020, CHS-1 received a consensually recorded telephone call from SHERMAN using 919-508-7035. During the call, SHERMAN told CHS-1, "I'ma talk to Big Bro and see if he can go ahead and let you do your thing. You know what I'm saying?" According to CHS-1, this meant SHERMAN was going to ask NIXON to supply heroin directly to CHS-1 so that CHS-1 would not have to use SHERMAN as a middleman.

37. On or about the afternoon of August 31, 2020, your affiant observed

---

[1] During a prison call on April 7, 2020, **NIXON** told an unknown male he was opening a club in downtown Wilmington named Dior's Lounge. Your affiant located an Instagram profile for "Dior's Lounge" which states, "Dior's is a New Premier Bar lounge locate Downtown 141 N Front St., Wilmington NC."

12

NIXON, THOMAS, SHERMAN, JOHNNY JERMAINE JOHNSON[2], RODERICK TYRONE SIMPSON[3], and WILLIAM JAWARAH LAMB[4] meeting in person at 141 N. Front Street. Information received pursuant to the execution of a Federal search warrant (7:20-mj-1191-RJ) on the **TARGET CELL PHONE** showed the **TARGET CELL PHONE** was located in the vicinity of 141 N. Front Street during the afternoon of August 31, 2020.

38.     On May 4, 2020, at about 9:59 a.m., **NIXON** received an incoming telephone call on 347-266-2309 (same IMEI as the **TARGET CELL PHONE**) from a male at Scotland Correctional Institution using the account of inmate Brandon Prevette. During the call, the NIXON said, "I'm holding it down on that, but I need the low down on that girl though. If you can make that happen, we can shake ASAP." The male said, "Yeah, he already told me what the lick read. Like yo. That's, that's coming from motherfucking uh, the Georgia Bulldog boy, you know what I'm saying?" NIXON said, "Yeah, I understand that." The male said, "He be like, they on they motherfuck, you know, motherfucker can't go from stadium to stadium, you know what I'm saying? After it get dark. After it get dark they be on some other shit by

---

[2] JOHNSON's criminal history includes convictions for murder and first-degree assault in connection with a 1996 murder which were subsequently overturned in 2013 due to prosecutorial misconduct. JOHNSON was released in 2013 when the State of Connecticut declined to retry JOHNSON and his fellow co-defendants. JOHNSON was also charged with firearm by felon and ADWWIKISI in February 2019, but these charges were dismissed in July 2020 when the victim of the shooting refused to cooperate with the prosecution.
[3] SIMPSON's criminal history includes convictions for PWISD cocaine (1990), PWISD cocaine (1994), Felony possession of cocaine (1994), felony possession of cocaine (1997), PWISD cocaine base greater than 50 grams (2000).
[4] LAMB's criminal history includes convictions for possession of cocaine (1991), PWISD cocaine (1995), three counts of assault on government official (1995), PWISD cocaine (1995), possession of firearm by felon (2001), felony possession of marijuana (2010).

13

going from uh stadium to stadium and shit. Looks like it's gonna take a little bit more time than they thought."

39.    Based on my training and experience and familiarity with the NIXON DTO, I know the word "girl" is slang for cocaine, so I believe NIXON was asking the inmate to get information from a cocaine supplier. I know "the lick read" is slang which means "the situation". I believe the "Georgia Bulldog boy" is code used to inform NIXON the cocaine supplier is a male from Georgia. I believe the statement about going from stadium to stadium is code used to discuss issues the cocaine supplier was experiencing when transporting drugs from city to city.

40.    On September 15, 2020, the **TARGET CELL PHONE** left Durham, North Carolina at about 12:00 p.m. and arrived in Atlanta, Georgia at about 5:00 p.m. The **TARGET CELL PHONE** remained in Atlanta until September 16, 2020, when it departed Atlanta at about 4:00 p.m. and arrived in Durham at about 8:00 p.m.

41.    Based on my training and experience, knowledge of the NIXON's previous conversation with an inmate from Scotland Correctional Institute about a cocaine supplier from Georgia and the length of time spent in Atlanta, I believe it is likely NIXON went to Atlanta to meet with a drug supplier. Additionally, I know cocaine traffickers in the Wilmington area are often supplied by individuals based in Atlanta.

42.    On September 30, 2020 at about 11:32 a.m., CHS-1 sent a text message to SHERMAN over 919-508-7035 which was captured by a consensual electronic

14

intercept monitored by the FBI. The text message CHS-1 sent to SHERMAN read, "Boy u treat me any kinda way...fuck I do 2 u."

43.     Your affiant reviewed a PRTT attached to the **TARGET CELL PHONE** and observed an incoming call from 919-508-7035 (known to be used by SHERMAN) placed on September 30, 2020 at about 11:32 a.m. which was unanswered.

44.     On September 30, 2020 at about 11:32 a.m., SHERMAN placed a telephone call to CHS-1 which lasted about two minutes and 26 seconds and was consensually monitored. During the call, SHERMAN said, "What you get? What you came with?" CHS-1 said, "I got like $2,000." SHERMAN said, "You about, you about motherfucking 10 joints. 10 bricks of some gas. For real." CHS-1 said, "From where? You got them, motherfucker?" SHERMAN said, "I can check. I think I got a dude. I think I know somebody that's got some fire-fire though for real. Let me check with him today, 'cause if you got two ($2,000) I'll check with him and I'll get it." CHS-1 said, "Ok." CHS-1 then said, "It's already packaged and stamped and all that shit?" SHERMAN said, "Yep." CHS-1 said, "So when do you want me to call you back man? I'm at work right now. You know I don't get off until four. I gotta go to T.A.S.C. tonight at six and I get out at seven." SHERMAN said, "Alright. Call me soon as you leave T.A.S.C. and I'll have an answer for you."

45.     Your affiant reviewed a PRTT attached to the **TARGET CELL PHONE** and observed an incoming call from 919-508-7035 (known to be used by SHERMAN) placed on September 30, 2020 at about 11:36 a.m. which was unanswered.

15

46.     Your affiant reviewed a PRTT attached to the **TARGET CELL PHONE** and observed an incoming call from 919-508-7035 (known to be used by SHERMAN) placed on September 30, 2020 at about 12:26 p.m. which was unanswered.

47.     On September 30, 2020 at about 4:43 p.m., CHS-1 placed a consensually monitored telephone call to SHERMAN at 919-508-7035 and said, "You didn't forget about me, did you?" SHERMAN said, "No. He still ain't called me back yet bro. I'm trying to get on, get him, get with him now. I done called him about four times."

48.     On September 30, 2020 at about 7:49 p.m., CHS-1 placed a consensually monitored telephone call to SHERMAN at 919-508-7035 and said, "What's going on with you?" SHERMAN said, "He ain't never called me back bro. I got another man I'm gonna call. I shot him a text."

49.     Based upon my training and experience and SHERMAN's previous disclosure to CHS-1 that he (SHERMAN) gets heroin from NIXON, I believe the calls placed to the **TARGET CELL PHONE** by SHERMAN immediately after CHS-1 contacted SHERMAN to set up a drug transaction show SHERMAN was likely contacting the **TARGET CELL PHONE** to obtain heroin for CHS-1. Further, I believe SHERMAN was likely referring to NIXON when he said he was still waiting on a male to call him back because SHERMAN's calls to NIXON on September 30, 2020 had not been answered or returned by the user of the **TARGET CELL PHONE** up to that point.

50.     On October 14, 2020, the FBI received historical text messages sent to and from the **TARGET CELL PHONE** pursuant to a search warrant served on

16

Verizon Wireless for the period covering October 2, 2002 to October 6, 2020. Your affiant reviewed these records and observed drug-related conversations, for example:

51.    On October 3, 2020, at about 8:16 p.m., an incoming text message from 910-742-8949 was received on the **TARGET CELL PHONE** which read, "Got alot of complaints 2 much baken soda." On the same day at about 8:17 p.m. an outgoing text message was sent from the **TARGET CELL PHONE** which read, "II KNOW II HEARD."

52.    Based on my training and experience, I believe the message "Got alot of complaints 2 much baken soda" indicates the user of 910-742-8949 is a drug dealer who distributed crack cocaine they received from NIXON to multiple individuals who were not satisfied with the quality of the drugs because they contained too much baking soda. Further, I believe the response sent from the **TARGET CELL PHONE** indicated NIXON likely distributed the crack cocaine to other individuals in addition to the user of 910-742-8949 because his response indicated he was already made aware of the poor quality of the crack cocaine.

53.    On October 4, 2020, at about 4:48 p.m., an outgoing text message was sent to 910-622-2327 from the **TARGET CELL PHONE** which read, "15,500." On the same day, at about 4:53 p.m., an outgoing text message was sent to 910-622-2327 from the **TARGET CELL PHONE** which read, "AM LEAVING AROUND 7:00." On the same day, at about 5:06 pm., an incoming text message from 910-622-2327 was received on the **TARGET CELL PHONE** which read, "1zip." On the same day, at about 5:06 p.m., an outgoing text message was sent to 910-622-2327 from the



17

**TARGET CELL PHONE** which read, "GOT U."

54.　Based on my training and experience, I am aware "zip" is a slang term commonly used by drug dealers to refer to an ounce of a controlled substance; therefore, I believe the user of 910-622-2327 was ordering one ounce of a controlled substance from **NIXON**. Further, I believe the reply from the **TARGET CELL PHONE**, "GOT U", meant NIXON intended to supply the user of 910-622-2327 with a controlled substance.

55.　Information received pursuant to the execution of a Federal search warrant (7:20-mj-1267-RJ) on the **TARGET CELL PHONE** and a North Carolina (NC) State Pen Register Trap and Trace (PRTT) on 919-508-7035 (used by SHERMAN) showed both SHERMAN and NIXON's phones were located in the vicinity of 1913 Carolina Beach Road, Wilmington at about 9:30 a.m. on October 25, 2020. Shortly thereafter, SHERMAN's cellular telephone travelled to Rocky Mount, NC, where it arrived at about 12:30 p.m. While SHERMAN's cellular telephone was in Rocky Mount, NC, your affiant observed SHERMAN's matte black colored Mercedes Benz and two black colored Porsche cars registered to THOMAS in the parking lot at 1913 Carolina Beach Road.

56.　SHERMAN's cellular telephone remained in Rocky Mount until about 4:00 p.m., at which time it departed in the direction of Wilmington. SHERMAN's cellular telephone returned to the vicinity of Wilmington at about 6:10 p.m. and first went to the area of Bonham Avenue where SHERMAN is believed to store drugs.

18

SHERMAN's cellular telephone then returned to the vicinity of 1913 Carolina Beach Road at about 6:26 p.m.

57.     At about 6:28 p.m. on the same day, your affiant observed SHERMAN's matte black colored Mercedes Benz depart the parking lot of 1913 Carolina Beach Road.

58.     A PRTT attached to the **TARGET CELL PHONE** recorded an incoming call from 919-508-7035 (used by SHERMAN) placed on October 25, 2020 at about 6:29 p.m. which lasted about four seconds. A PRTT attached to the **TARGET CELL PHONE** recorded an outgoing call to 919-508-7035 (used by SHERMAN) placed on October 25, 2020 at about 6:39 p.m. which lasted about 56 seconds. A PRTT attached to the **TARGET CELL PHONE** recorded an outgoing call to 919-508-7035 (used by SHERMAN) placed on October 25, 2020 at about 6:42 p.m. which lasted about two minutes and 10 seconds.

59.     Based on my training and experience and familiarity with this investigation, I believe it is likely SHERMAN left his Mercedes Benz at 1913 Carolina Beach Road in order to use a vehicle belonging to another co-conspirator for the trip to Rocky Mount. Based on my training and experience, this behavior is consistent with that of an individual making a trip to acquire a quantity of drugs. I believe NIXON's presence at 1913 Carolina Beach Road prior to SHERMAN departing on the trip and SHERMAN's telephone calls with the **TARGET CELL PHONE** immediately following SHERMAN's return to 1913 Carolina Beach Road indicates that SHERMAN's trip may have been on behalf of NIXON.

19

60.     On November 3, 2020, at about 3:00 p.m., your affiant and FBI Task Force Officer (TFO) Jonathan Davis observed NIXON speaking with the driver of a Nissan Maxima registered to CRANSTON LAMONT ANDREWS[5], Jr. NIXON then entered the driver's seat of a black colored Mercedes Benz coupe registered to Monique Simon-McNair of Garner, NC and departed 1913 Carolina Beach Road.

61.     According to location data obtained via Federal search warrant (7:20-mj-1267-RJ), the **TARGET CELL PHONE** was in the vicinity of 1913 Carolina Beach Road at the time we observed NIXON.

62.     Your affiant and TFO Davis followed NIXON southbound on Carolina Beach Road. NIXON drove to 725 Bragg Drive, Wilmington and parked the black colored Mercedes Benz. Your affiant and TFO Davis then observed NIXON entering the door of 725 Bragg Drive, Apartment G.

63.     According to location data obtained via Federal search warrant (7:20-mj-1267-RJ), the **TARGET CELL PHONE** was in the vicinity of 725 Bragg Drive at the time we observed NIXON.

64.     Based on my training and experience and familiarity with this investigation, I believe it is likely the Bragg Drive apartment is a stash location used by NIXON. Throughout this investigation, vehicles driven by NIXON have been observed in the vicinity of 725 Bragg Drive and location data for the **TARGET CELL PHONE** received pursuant to Federal search warrants has consistently shown the

---

[5] ANDREWS was released from Federal prison in March 2018 and his criminal history includes convictions for drug related offenses.



20

**TARGET CELL PHONE** to stop in the vicinity of 725 Bragg Drive for short periods of time prior to visiting other areas of Wilmington.

65.     On or about November 10, 2020, Cooperating Defendant 2 (hereinafter, "CD-2") told the FBI that CD-2 spoke with someone from Wilmington in about October 2020 who had recently been arrested. CD-2 told the FBI that individual said THOMAS and NIXON controlled the supply of drugs in Wilmington and that NIXON had good quality heroin.

66.     On or about November 12, 2020, at about 7:00 a.m., the device bearing cellular telephone number 919-508-7035 (used by SHERMAN) departed Wilmington and travelled to Jacksonville, Florida, where it arrived at about 1:50 p.m., according to information from a NC State PRTT on 919-508-7035.

67.     Your affiant reviewed a PRTT attached to 919-508-7035 (used by SHERMAN) and observed an outgoing call to Jacksonville telephone number 904-742-7548, placed at about 1:51 p.m. on November 12, 2020, which lasted about one minute and 21 seconds.

68.     Your affiant reviewed a PRTT attached to 919-508-7035 (used by SHERMAN) and observed an outgoing call to Jacksonville telephone number 904-742-7548, placed at about 2:27 p.m. on November 12, 2020, which lasted about one minute and 47 seconds.

69.     Your affiant reviewed a PRTT attached to 919-508-7035 (used by SHERMAN) and observed an incoming call from Jacksonville telephone number 904-

21

742-7548, received at about 2:33 p.m. on November 12, 2020, which lasted about two minutes and 27 seconds.

70.   Your affiant reviewed a PRTT attached to 919-508-7035 (used by SHERMAN) and observed an incoming call from Jacksonville telephone number 904-742-7548, received at about 2:50 p.m. on November 12, 2020, which lasted about nine seconds.

71.   On or about November 12, 2020, at about 6:41 p.m., CHS-1 placed a consensually recorded telephone call to SHERMAN on 919-508-7035 which lasted about one minute and nine seconds. During the call, SHERMAN told CHS-1 he would have 50 clips (of heroin) ready for CHS-1 the next day.

72.   Based on my training and experience, and my familiarity with this investigation, I know SHERMAN meant he would have 50 clips (approximately 2,500 dosage units) of heroin for CHS-1.   Additionally, because CHS-1 spoke with SHERMAN on 919-508-7035 while the device bearing cellular telephone number 919-508-7035 was located in Jacksonville, I know SHERMAN travelled to Jacksonville.

73.   On or about November 12, 2020, at about 7:07 p.m. CHS-1 received a text message from SHERMAN on 919-508-7035 which was captured by a consensual electronic intercept monitored by the FBI. The text message read, "Err thang good bro. Got those for u. And it's a fire flame."

74.   Based on my training and experience, and my familiarity with this investigation, I know SHERMAN meant he had drugs ready for CHS-1 to purchase and the drugs were good quality (fire flame).

22

75.    The device bearing cellular telephone number 919-508-7035 (used by SHERMAN) remained in Jacksonville, until about 7:30 p.m. on November 12, 2020, when it departed for Wilmington, according to information from a NC State PRTT on 919-508-7035.

76.    Your affiant reviewed a PRTT attached to 332-999-5745 (used by NIXON) and observed an outgoing call to Jacksonville telephone number 904-451-5789, placed at about 7:44 p.m. on November 12, 2020, which lasted about four seconds.

77.    Your affiant reviewed a PRTT attached to 332-999-5745 (used by NIXON) and observed an outgoing call to Jacksonville telephone number 904-451-5789, placed at about 7:44 p.m. on November 12, 2020, which lasted about 13 seconds.

78.    Your affiant reviewed a PRTT attached to 332-999-5745 (used by NIXON) and observed an outgoing call to Jacksonville telephone number 904-451-5789, placed at about 7:45 p.m. on November 12, 2020, which lasted about 55 seconds.

79.    Your affiant reviewed a PRTT attached to 332-999-5745 (used by NIXON) and observed an outgoing call to Jacksonville telephone number 904-451-5789, placed at about 8:53 p.m. on November 12, 2020, which lasted about 55 seconds.

80.    Your affiant reviewed a PRTT attached to 919-508-7035 (used by SHERMAN) and observed an outgoing call to 910-599-7241 (used by THOMAS) placed at about 12:37 a.m. on November 13, 2020, which lasted about 19 seconds.

23

81.     Your affiant reviewed a PRTT attached to 919-508-7035 (used by SHERMAN) and observed an incoming call from 910-599-7241 (used by THOMAS), received at about 1:15 a.m. on November 13, 2020, which lasted about 5 seconds.

82.     Your affiant reviewed a PRTT attached to 332-999-5745 (used by NIXON) and observed an outgoing call to Jacksonville telephone number 904-451-5789, placed at about 1:55 a.m. on November 13, 2020, which lasted about 35 seconds.

83.     Your affiant reviewed a PRTT attached to 332-999-5745 (used by NIXON) and observed an outgoing call to Jacksonville telephone number 904-451-5789, placed at about 2:12 a.m. on November 13, 2020, which lasted about one minute and 33 seconds.

84.     The device bearing cellular telephone number 919-508-7035 (used by SHERMAN) returned to Wilmington and arrived in the vicinity of 1913 Carolina Beach Road at about 2:15 a.m., according to information from a NC State PRTT on 919-508-7035.

85.     Your affiant reviewed a PRTT attached to 919-508-7035 (used by SHERMAN) and observed an outgoing call to the **TARGET CELL PHONE**, placed at about 2:19 a.m. on November 12, 2020, which lasted about two minutes and 55 seconds.

86.     Your affiant reviewed a PRTT attached to 332-999-5745 (used by NIXON) and observed an outgoing call to Jacksonville telephone number 904-451-5789, placed at about 3:40 a.m. on November 13, 2020, which lasted about 21 minutes and 17 seconds.



24

87.     Based on my training and experience and my familiarity with this investigation, the purpose of SHERMAN's trip to Jacksonville was likely to acquire drugs from a supplier. Based on the telephone calls placed to THOMAS during SHERMAN's trip, as well as SHERMAN's return to the vicinity of 1913 Carolina Beach Road at about 2:15 a.m. on November 13, 2020, I believe THOMAS was likely involved in the trip. Additionally, because NIXON's cellular telephone began having telephonic contact with the user of a Jacksonville telephone number on or about November 12, 2020, I believe NIXON was also involved with SHERMAN's trip. Further, I believe SHERMAN's telephone call to the **TARGET CELL PHONE** minutes after SHERMAN returned to the vicinity of 1913 Carolina Beach Road also indicates SHERMAN's trip was likely on behalf of NIXON and THOMAS.

88.     On or about November 19, 2020, Cooperating Defendant 1 (hereinafter, "CD-3") told the FBI that THOMAS and NIXON are large scale drug traffickers in the Wilmington area. CD-3 said THOMAS receives approximately 15-20 kilograms of cocaine from a Mexican supplier about every two weeks. CD-3 also said NIXON went to Atlanta in about September 2020 to get kilograms of cocaine from a supplier and that ANDREWS is a cocaine dealer.

89.     A prior search warrant (7:20-MJ-1232-RJ) for location information for the **TARGET CELL PHONE** confirmed that the **TARGET CELL PHONE** traveled to Atlanta from September 15, 2020 to September 16, 2020.

90.     Information received pursuant to the execution of a Federal search warrant (7:20-mj-1297-RJ) on the **TARGET CELL PHONE** showed the **TARGET**



25

**CELL PHONE** was located in the vicinity of 1913 Carolina Beach Road, Wilmington at about 11:46 a.m. on November 25, 2020.

91.     Your affiant reviewed video footage captured on November 25, 2020 in the vicinity of 1913 Carolina Beach Road and observed NIXON arrive in a white panel van which parked near the rear entrance to 1913 Carolina Beach Road at about 11:46 a.m. NIXON and an unidentified male moved objects around near the van and rear entrance to 1913 Carolina Beach Road. NIXON spoke with ANDREWS in the parking lot and then departed in the van.

92.     Information received pursuant to the execution of a Federal search warrant (7:20-mj-1297-RJ) on the **TARGET CELL PHONE** showed the **TARGET CELL PHONE** was located in the vicinity of 1811 Queen Street, Wilmington, NC from about 9:09 a.m. to 9:54 a.m. on December 2, 2020.

93.     On December 2, 2020, CHS-1 told the FBI about an after hours spot operating near Queen Street and Colwell Avenue in Wilmington which was called Queens Corner. CHS-1 said this location serves liquor without a license.

94.     On December 10, 2020, your affiant and FBI SA William Anderson identified a building located at 1811 Queen Street in Wilmington located on the corner of Queen Street and South 19th Street. The building was clad in purple colored siding and had a blue colored tarp over the roof. The building also had the letters "Q.C" painted on the side with a crown painted along the top of the letter "Q". The building had bars on the windows, metal security doors, and signs indicating there was an "ATM" inside.



26

95.   Information received pursuant to the execution of a Federal search warrant (7:20-mj-1297-RJ) on the **TARGET CELL PHONE** showed the **TARGET CELL PHONE** was located in the vicinity of 1811 Queen Street in Wilmington, NC from about 9:36 a.m. to about 9:48 a.m. on December 10, 2020.

96.   Your affiant reviewed a PRTT attached to the **TARGET CELL PHONE** and observed an outgoing call to 919-508-7035 (used by SHERMAN), placed at about 9:48 a.m. on December 10, 2020, which lasted about 48 seconds.

97.   Information received pursuant to the execution of a Federal search warrant (7:20-mj-1297-RJ) on the **TARGET CELL PHONE** showed the **TARGET CELL PHONE** was located in the vicinity of SHERMAN's apartment at the Cape Cottages Condominiums from about 10:15 a.m. to 10:25 a.m. on December 10, 2020.

98.   Information received pursuant to the execution of a Federal search warrant (7:20-mj-1297-RJ) on the **TARGET CELL PHONE** showed the **TARGET CELL PHONE** was located in the vicinity of 725 Bragg Drive from about 10:41 a.m. to 10:45 a.m. on December 10, 2020.

99.   Information received pursuant to the execution of a Federal search warrant (7:20-mj-1297-RJ) on the **TARGET CELL PHONE** showed the **TARGET CELL PHONE** was located in the vicinity of SHERMAN's apartment at the Cape Cottages Condominiums from about 10:56 a.m. to at least 10:57 a.m. on December 10, 2020.

100.   Based on my training and experience, and familiarity with this investigation, I believe it is likely that NIXON met SHERMAN on the morning of



27

December 10, 2020 to conduct a drug transaction because the TARGET CELL phone left the vicinity of SHERMAN's apartment, travelled to the vicinity of Bragg Drive (believed to be a stash location used by NIXON), and then returned to the vicinity of SHERMAN's apartment.

101. Based upon your affiant's knowledge of NIXON's history as a drug trafficker and NIXON's use of the **TARGET CELL PHONE** to contact SHERMAN to arrange drug transactions, I am informed and believe that NIXON is using the **TARGET CELL PHONE** to facilitate drug transactions. Information obtained pursuant to the execution of the previous search warrant for geo-location data on the **TARGET CELL PHONE** has helped investigators confirm that SHERMAN and NIXON had telephonic contact and were located in the same physical area at times CHS-1 reported NIXON would be supplying SHERMAN with drugs. Information obtained pursuant to the execution of the previous search warrant for geo-location data on the **TARGET CELL PHONE** has also helped investigators locate NIXON and observe NIXON meeting with other known drug traffickers. Additionally, information obtained pursuant to the execution of the previous search warrant for geo-location data on the **TARGET CELL PHONE** helped investigators identify a trip made to Atlanta, Georgia where the TARGET CELL PHONE remained for less than 24 hours, and the FBI later received information from CD-2 which supported your affiant's belief that the purpose of this trip was to acquire a quantity of drugs. Information obtained pursuant to the execution of the previous search warrant for geo-location data on the TARGET CELL PHONE also helped the FBI identify



28

NIXON's presence on multiple days at various times at an illegal liquor house in Wilmington.

102.   Based upon these facts, it is probable that information related to the **TARGET CELL PHONE** pertains to illegal narcotics activity and further monitoring will continue to help investigators identify NIXON's drug supplier, stash locations, and co-conspirators.

### TECHNICAL ASSISTANCE OF GEO-LOCATION

103.   In my training and experience, I have learned that Verizon Wireless is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve

29



every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

104.   Based on my training and experience, I know that Verizon Wireless can collect cell-site data about the **"TARGET CELL PHONE."** I also know that wireless providers such as Verizon Wireless typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

### AUTHORIZATION REQUEST

105.   Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c), authorizing the government to obtain the information requested in Attachment B from the **TARGET CELL PHONE** described in Attached A for a period of 30 days. Authorization is sought for the telephone number for **TARGET CELL PHONE**, and any other telephone number subsequently assigned to an instrument bearing the same IMEI number used by **TARGET CELL PHONE**, and to any other IMEI number to which the telephone number for **TARGET CELL PHONE** is assigned, within the thirty-day period. The authorization is also intended to apply to **TARGET CELL PHONE** regardless of service provider.

106.   I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate

30

notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **TARGET CELL PHONE** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

107. I further request that the Court direct Verizon Wireless to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Verizon Wireless. I also request that the Court direct Verizon Wireless to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Verizon Wireless' services, and at such intervals and times directed by the government. The government shall reasonably compensate Verizon Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

31

108.   I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **TARGET CELL PHONE** outside of daytime hours.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

32

109. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution. Working copies of the affidavit and search warrant may be served on FBI Agents and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, and Verizon Wireless as necessary to effectuate the Court's order.

Respectfully submitted,

James D. Byers
Special Agent
Federal Bureau of Investigation

On this _11_ day of ~~October,~~ December, 2020, James D. Byers, appeared before me via reliable electronic means, was placed under oath, and attested to the contents of this Affidavit.

ROBERT B. JONES, JR.
UNITED STATES MAGISTRATE JUDGE

33

## ATTACHMENT A

**Property to Be Searched**

1.  The cellular telephone assigned call number **(470) 462-9908 ("TARGET CELL PHONE")**, whose service provider is Verizon Wireless, a wireless communications service provider that is headquartered at 180 Washington Valley Road, Bedminster, NJ, 07921.

2.  Records and information associated with the location of the **TARGET CELL PHONE** that is within the possession, custody, or control of Verizon Wireless, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

34

## ATTACHMENT B

**Particular Things to be Seized**

### I.    Information to be Disclosed by the Provider

All information about the location of the **TARGET** described in Attachment A for a period of 30 days during all times of day and night. "Information about the location of the **TARGET CELL PHONES** includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, **"Location Information"**) is within the possession, custody, or control of Verizon Wireless, Verizon Wireless is required to disclose the **Location Information** to the government. In addition, Verizon Wireless must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the **Location Information** unobtrusively and with a minimum of interference with Verizon Wireless' services, and at such intervals and times directed by the government.  The government shall compensate Verizon Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the **Location Information**. *See* 18 U.S.C. § 3103a(b)(2).

35

## II. Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. §§ 846 and 841 involving identified and/or unidentified subjects.

36